# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. 11-cr-40085-JAR |
| RICHARD ADRIAN SANCHEZ, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This case comes before the Court on Defendant Richard Sanchez's Motion to Suppress Evidence (Doc. 14). Defendant moves to suppress all evidence seized from the vehicle he was driving on August 30, 2011, when officers stopped him in Wabaunsee County, Kansas. He also seeks to suppress any statements made following the stop and arrest. The Court has thoroughly considered the parties' briefs and the evidence presented at the November 23, 2011 hearing on this motion, and the Court is now prepared to rule. As explained below, Defendant's motion is denied.

## I.    Factual Background

Based on the testimony and evidence admitted at the hearing on this motion, the Court finds as follows. On August 30, 2011, Kansas Highway Patrol troopers posted drug check lane signs on Interstate 70 in Wabaunsee County, Kansas. One sign stated that there was a drug check lane ahead and another sign stated that a drug dog was working in the area. These signs were a ruse; there was no drug check lane. Just past the signs on the interstate, vehicles could exit at the Tallgrass Road exit—a rural gravel road with no services available and no businesses viewable from the interstate.

At approximately 8:57 p.m., Trooper Brent Hogelin and Trooper Jarret Ranieri were on duty, wearing full police uniforms, and sitting in a marked patrol car on Tallgrass Road when they noticed a Chrysler Pacifica exit eastbound Interstate 70 at the Tallgrass Road exit. The vehicle turned south and continued to drive down the gravel road. As the Pacifica passed Trooper Hogelin's location, he observed that it displayed a Missouri registration. Thinking it odd that a Missouri-tagged vehicle would be traveling on rural gravel roads at night and mindful that the Pacifica had exited the interstate at the first available opportunity after passing the drug check lane signs, Trooper Hogelin believed the vehicle was probably involved in illegal drug activity. Without turning his squad car lights on, Trooper Hogelin turned his car around and began following the Pacifica to see if its driver would commit a traffic violation so that he could stop the car and see why it exited the interstate.

Within about a mile, Trooper Hogelin caught up to the vehicle and followed it for another half mile. While following the Pacifica, Trooper Hogelin took the opportunity to check its registration, which came back as registered to an individual named Arturo Martinez at an address in Kansas City, Missouri. The Pacifica then turned right onto Goosebury Road, another gravel road. Trooper Hogelin testified that the Pacifica turned without using its turn signal in violation of K.S.A. § 8-1548, which requires that a vehicle turning right signal its turn continuously for at least 100 feet before the turn. The Court finds credible Trooper Hogelin's testimony that the Pacifica did not use the turn signal.

Trooper Hogelin then activated his emergency lights to initiate a traffic stop of the Pacifica. The Pacifica immediately came to a stop. Trooper Hogelin got out of the patrol car and approached the Pacifica's driver's side window. Defendant, the driver of the Pacifica,

immediately volunteered that he was looking for a gas station. Trooper Hogelin told Defendant that he had pulled him over because he failed to use a turn signal when turning right, and then he asked Defendant for identification and registration. Trooper Hogelin also engaged Defendant in conversation, asking further about why Defendant exited the interstate and his travel plans. Trooper Ranieri meanwhile searched the exterior of the car and looked in the car using his flashlight. Defendant spoke freely with Trooper Hogelin, stating that he was driving from Phoenix to Kansas City and that he was looking for a gas station but could not find one. Trooper Hogelin noted that the gas gauge showed that Defendant had more that one fourth of a tank left.

Defendant handed Trooper Hogelin an Arizona Identification Card, which identified him as Richard Sanchez, but Defendant did not produce a driver's license. Trooper Hogelin noted this because failure to produce a valid driver's license is a misdemeanor offense in Kansas under K.S.A. § 8-244. Trooper Hogelin then asked who owned the vehicle, and Defendant stated that the vehicle belonged to his friend Francisco who lived in Kansas City. He also mumbled a last name that Trooper Hogelin could not understand and mumbled another name that Trooper Hogelin could not understand. Defendant eventually clarified that the other name was Juan. Trooper Hogelin questioned Defendant about why he had Francisco's car. Defendant stated that Francisco was in Phoenix visiting family when his car broke down. The fuel pump needed to be repaired, so Francisco left the car in Phoenix for repairs and flew back to Kansas City. Defendant further explained that Francisco, whose family lived next door to Defendant in Phoenix, had asked Defendant to drive the car back to Kansas City for him. Defendant further stated that he was going to fly back to Phoenix from Kansas City the next day, but he did not have the ticket yet because Francisco was going to buy it for him when he arrived in Kansas

City. While giving this explanation, Defendant continually cleared his throat, avoided eye contact, and seemed nervous. Trooper Hogelin believed that Defendant's mannerisms indicated he was being deceptive.

As Trooper Hogelin spoke with Defendant, he checked the insurance card that Defendant had given him. He noted that the card identified the insured as Arturo Martinez, which matched the registration information. He also noted that the insurer listed on the card was Francisco Banuelos, an insurance agent out of Kansas City. Trooper Hogelin thought that Defendant had read the insurance card to find the owner's name but had mistakenly identified the insurer instead of the insured as the owner of the vehicle. Trooper Hogelin asked Defendant the name of the owner again and Defendant told him it was the name on the insurance card. Trooper Hogelin also noticed McDonald's wrappers in the car, the ashtray overflowing with cigarettes, and two cell phones in the vehicle.

Troopers Hogelin and Raneiri then went back to the patrol car to run Defendant's identification. They found that Defendant had two nonextraditable warrants from Nevada and Florida and had a suspended driver's license. Trooper Hogelin noted this additional law violation—driving with a suspended license — is another traffic violation under K.S.A. § 8-262 and the troopers could have arrested Defendant for this violation. At this point, Trooper Hogelin was confident that Defendant had illegal contraband in the car because he exited the interstate right after the ruse drug lane onto a rural gravel road that did not lead to fuel, restroom or other services, Defendant did not own the vehicle he was driving and did not know the owner's name, he gave a vague travel itinerary and explanation for why he was driving the vehicle, he had McDonald's wrappers and an overflowing ashtray, indicating that he did not stop for any length

of time, and he displayed a nervous demeanor when questioned about ownership of the vehicle.

Now a little under fifteen minutes into the stop, Trooper Hogelin decided not to issue a citation for the violations but wanted to get consent from Defendant to search the vehicle. Trooper Raneiri stayed in the patrol car as Trooper Hogelin returned to the driver's side window. Trooper Hogelin returned the papers and identification to Defendant. He asked Defendant about what happened to his driver's license because it was suspended. Trooper Hogelin then told Defendant that he was not going to give him a citation but that Defendant could not drive his vehicle because his license was suspended. Defendant engaged him in conversation about what he should do since he could not drive. Trooper Hogelin told him that he would have to call a friend to pick him up. They then had a discussion about what Defendant could do with the vehicle. Trooper Hogelin told Defendant that he was going to drive off one way and Defendant could do what he wanted as long as he did not drive the vehicle. Trooper Hogelin then said that was all he had for Defendant, wished him luck, and turned and took a step back from the vehicle.

Trooper Hogelin then turned back to the driver's window, said that he had a question if Defendant did not mind, and asked Defendant if that would be alright. Defendant said yes. Trooper Hogelin then asked him more questions about the owner of the vehicle, why Defendant was driving the vehicle, where he came from, and where he was going. The entire time, Trooper Hogelin maintained a conversational tone with Defendant. When Trooper Hogelin asked Defendant where he was going, Defendant did not give an address but merely said he was driving to the address on the insurance card. When asked again about the problem with the car, Defendant stated that the fuel line had been replaced, which was different from what he said earlier when he said the fuel pump had been replaced. He stated that he had picked up the

5

vehicle from a repair facility, but he could not identify the name of the facility. He also said the owner was Francisco and Juliano, instead of Juan.

Trooper Hogelin then asked Defendant if he had anything illegal in the vehicle and Defendant answered that there was not anything illegal; he had some beer in the back, but the officer could check if he wanted. Trooper Hogelin clarified that he would like to search the vehicle instead of check it, and Defendant indicated he understood and agreed that the officer could search the vehicle. The Defendant stepped out of the vehicle, and Trooper Hogelin asked if he could pat him down for safety. Defendant agreed to the pat down.

Troopers Hogelin and Ranieri then searched the vehicle while Defendant waited in front of the vehicle. The troopers noticed that the front grill and light assembly appeared to have been taken off recently. The assembly had fresh, shiny bolt heads, but looked like it had been systematically sprayed with dirt to hide the shiny tooling. Also, the black undercarriage coating looked like it had been recently sprayed on the car. The troopers also noticed foam coming out of a hole and a plastic bag sticking out of one of the screw holes in the frame. Based on his extensive experience on the drug administration task force, Trooper Hogelin believed that the frame rail had a hidden compartment containing illegal drugs. Trooper Hogelin then told Defendant that he would like to take the vehicle to another location to search it and asked Defendant if that was alright with him. Defendant said yes. Trooper Hogelin explained that Defendant could ride with him to the other location about six miles away and that Trooper Ranieri would drive the Pacifica because Defendant had a suspended license. Defendant agreed and rode with Trooper Hogelin to a Kansas Department of Transportation ("KDOT") facility six miles east on Interstate 70.

6

When they arrived at the KDOT facility, Trooper Hogelin again explained that they wanted to search the vehicle more at the facility, and he asked Defendant if that was alright. Defendant again agreed that the troopers could search the vehicle. At no time did Defendant protest, object, attempt to limit the scope of the search, or revoke his consent to search.

At the KDOT facility, the troopers dismantled the front bumper and found a package inside in black electrical tape. When they opened the package, it appeared to contain methamphetamine. The troopers found approximately three pounds of methamphetamine hidden in the front bumper of the Pacifica.

## II. Discussion

Defendant focuses his argument for suppression on the lack of reasonable suspicion for the initial stop. Defendant states that the evidence does not show that he committed a traffic violation when the troopers stopped the Pacifica, and thus the detention was unlawful. Further, Defendant points out that even if the troopers had reasonable suspicion for the initial stop, the troopers went beyond the scope of the circumstances which justified the initial stop, asking about matters unrelated to the initial stop and keeping Defendant longer than necessary to resolve a turn signal violation. Defendant also suggests that his consent to search the vehicle was not valid and the troopers went beyond the scope of any consent. The Government responds that Defendant does not have standing to challenge the search, but that even if he does, the detention and search were lawful. The Court need not discuss whether Defendant has standing to challenge the detention and search because, as explained below, the detention and search were lawful.

### A. The Initial Traffic Stop

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief."[1] A lawful, reasonable traffic stop begins when a vehicle is pulled over for investigation of a violation of traffic laws.[2] The reasonableness of the stop is determined by applying the principles of *Terry v. Ohio*[3] and thus depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[4]

Here, the initial stop was justified because Defendant committed a traffic violation. Trooper Hogelin testified that while following behind Defendant, he saw Defendant turn right onto Goosebury Road without using his turn signal, which is a traffic violation under K.S.A. § 8-1548. The video recording from his in-car recording system supports the trooper's testimony. While the video does not show the entire vehicle, the brake lights can be seen and no turn signal is visible. At the end of the video, when Trooper Hogelin is following the Pacifica driven by Trooper Ranieri to the KDOT facility and the turn signal is used, it is bright and easily visible above the brake lights. If Defendant had used his turn signal while turning onto Goosebury Road, the signal should have been visible in the video. Additionally, when Trooper Hogelin informed Defendant that he had stopped him for failure to use a turn signal, Defendant did not protest. And so the Court finds Trooper Hogelin's testimony credible and finds that he had

---

[1] *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (internal quotation marks omitted)).

[2] *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

[3] 392 U.S. 1 (1968).

[4] *Id.* at 19–20.

reasonable suspicion for the initial stop because he saw Defendant commit a traffic violation.

B.    The Scope of the Detention

The Court also finds that the scope of the stop was reasonable. To be reasonable, the scope of a traffic stop must last no longer than necessary to effectuate the purpose of the stop and must be carefully tailored to the underlying purpose of the stop.[5] During a routine traffic stop, officers may request a driver's license and registration for the vehicle, run a computer check on the information given, and issue a citation.[6] Officers may also normally ask questions about the driver's travel plans without exceeding the scope of the traffic stop because "inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."[7] Once the driver has produced a valid license and proof that he is entitled to operate the vehicle, he must be allowed to proceed on his way without being subject to further delay by police for additional questioning.[8] But an officer may continue to detain an individual if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or if the detention has become a consensual encounter.[9]

Here, while effectuating the traffic stop for the turn signal violation, Trooper Hogelin not only developed an objectively reasonable and articulable suspicion that illegal activity was

---

[5]*United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997).

[6]*Id.*; *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995).

[7]*Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100–01 (2005)).

[8]*United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994) (citing *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994)).

[9]*Id.* (citing *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)); *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004).

occurring but also converted the detention into a consensual encounter. Once Trooper Hogelin stopped the Pacifica, he went up to the vehicle to speak with Defendant. Trooper Hogelin explained why he had stopped Defendant, asked for license and registration, and questioned Defendant about his travel plans. When Defendant failed to produce a driver's license, instead giving only an Arizona Identification Card, Defendant violated another traffic law—K.S.A. § 8-244, which requires a driver to produce a valid driver's license to an officer upon request. At that point, the trooper also noted that Defendant was not the registered owner of the car and lived in a different state than the registered owner of the car. Trooper Hogelin then questioned Defendant about who owned the car and why he was driving it, checking the registration documents against Defendant's explanations. Defendant was unable to correctly identify the owner of the vehicle he was driving and had a vague explanation for his travel plans. While answering the trooper's questions about the owner of the vehicle, Trooper Hogelin believed Defendant appeared nervous because he avoided eye contact and kept clearing his throat.

Trooper Hogelin initially only questioned Defendant for about three minutes, which was a reasonable time to discuss the reason for the stop and for the trooper to determine whether Defendant was entitled to operate the vehicle. After the three minutes of questioning, Trooper Hogelin returned to the patrol car to run a check on the registration documents and Defendant's identification card. Trooper Hogelin learned that Defendant's driver's license had been suspended—he had been driving without a valid license in violation of K.S.A. § 8-262, giving Trooper Hogelin probable cause to arrest him. Trooper Hogelin also discovered that Defendant had a criminal record with two nonextraditable outstanding warrants—one from Florida and one from Nevada.

Trooper Hogelin testified that at that point he was confident that Defendant had illegal contraband in the vehicle. The Court finds that Trooper Hogelin had an objectively reasonable and articulable suspicion to detain Defendant further to investigate that illegal activity. Whether an officer had an objectively reasonable and articulable suspicion of criminal activity is determined by the totality of the circumstances.[10] A law enforcement officer can use his experiences and training to distinguish between innocent and suspicious activities.[11] And an officer can use factors consistent with innocent travel to help form reasonable suspicion.[12]

Here, Defendant had exited the interstate at the first opportunity after the ruse-drug-check-lane signs. The vehicle had Missouri plates but chose to drive down a rural gravel road with no visible services available. The trooper also learned that Defendant did not own the vehicle he drove and could not correctly identify the owner, he had a vague travel plan and explanation for why he was driving the vehicle, he had a suspended license and outstanding warrants, and he had McDonald's wrappers and an overflowing ashtray, indicating that he did not stop for any length of time. Defendant also displayed a nervous demeanor when questioned about the ownership of the vehicle. These circumstances taken as a whole, support a reasonable suspicion of illegal drug activity. Thus the circumstances justified the further investigatory detention when the trooper returned to the car, began asking Defendant more questions about his travel plans and the owner of the car, and requested consent for a search of the vehicle.

But although Trooper Hogelin could have detained Defendant further to investigate his

---

[10] *United States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2005).

[11] *United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994).

[12] *United States v. Sokolow*, 490 U.S. 1, 9–10 (1989).

11

reasonable suspicion of drug activity or could have arrested Defendant for driving with a suspended license, Trooper Hogelin decided to end the detention and turn it into a consensual encounter. If an encounter between an officer and a driver becomes consensual and the driver voluntarily answers further questions, no further Fourth Amendment seizure occurs.[13] A traffic stop may become a consensual encounter if the officer returns all the documents to the driver and asks the driver questions without constraining the driver with a coercive show of authority.[14] "'Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.'"[15] Factors that weigh in favor of a coercive show of authority include "the presence of more than one officer, the display of a weapon, physical touching by the officer, or use of a commanding tone of voice indicating that compliance might be compelled."[16] "An unlawful detention occurs only when the driver has an 'objective reason to believe he or show is not free to end the conversation with the officer and proceed on his or her way.'"[17]

By the time Trooper Hogelin asked Defendant the additional questions about his travel plans, the encounter had become consensual. Trooper Hogelin had returned all of Defendants documents, he used a conversational tone the entire time he spoke with Defendant, and he made it clear that Defendant was free to do what he wanted as long as he did not drive. And while

---

[13]*Bradford*, 423 F.3d at 1158.

[14]*Id.*

[15]*Id.* (quoting *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000)).

[16]*United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991).

[17]*Bradford*, 423 F.3d at 1158 (quoting *West*, 219 F.3d at 1176).

Defendant was in a rural area with two officers present at the scene, a reasonable person would have felt free to end the conversation with the officer and proceed on his own. It was Defendant, in fact, who continued to ask Trooper Hogelin questions after the trooper told him that he was going to leave. Trooper Hogelin answered Defendant's questions and gave Defendant suggestions about what he should do to get to Kansas City. Trooper Hogelin then told Defendant that was all he had, wished him luck, and stepped back from the vehicle, showing the detention was finished. And when Trooper Hogelin asked more questions, he asked Defendant permission first. The circumstances did not present a coercive show of force suggesting that the detention had not ended. And so the trooper's further questions and request to search the vehicle did not violate Defendant's Fourth Amendment rights.

    C.    **Valid Consent to Search**

Defendant further argues, however, that even if the search was not illegal as the fruit of an illegal detention, it was illegal because his consent was not intelligently and freely given. Defendant argues that because he did not understand the scope of the search, the consent was not valid. The Court disagrees and finds that Defendant's consent for the search was intelligently and freely given.

Detention and warrantless search by officers can be reasonable and lawful if consent is valid.[18] The burden of proving valid consent falls on the government.[19] The government must present "clear and positive testimony that consent was unequivocal and specific and freely and

---

[18] *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cr. 1998).

[19] *Id.* (citing *United States v. Cody*, 7 F.3d 1523, 1526 (10th Cir. 1993)).

intelligently given."[20]  The government must also show that the consent was not the result of coercion.[21]  The determination of whether valid consent was given is made upon the totality of the circumstances.[22]  Here, based on the totality of the circumstances, the Court finds that the consent was valid.

First, Defendant was not coerced into consenting to the search.  Although the added knowledge that another trooper was in the a patrol car when Defendant talked to Trooper Hogelin and the remote location had the potential to make the situation more coercive, the Court finds that other circumstances outweighed those potentially coercive circumstances.  Trooper Hogelin had returned Defendant's papers and answered his inquiries about what to do with the car and how to get to Kansas City, and Defendant does not contend that the trooper touched him, threatened him, displayed his weapon, or spoke in an aggressive tone.  Also, it was not the trooper that first suggested the search—Defendant himself volunteered permission to check the car.  In similar circumstances, the Tenth Circuit, in *United States v. Rosborough*, upheld a finding that a defendant voluntarily consented to search.[23]  This Court similarly finds that here Defendant voluntarily consented to a search.

Second, Defendant freely and intelligently consented to the search.  Defendant states that his consent was not freely and voluntarily given because he did not understand that the troopers wanted to do more than "check" the vehicle.  The evidence, however, demonstrates otherwise.

---

[20]*Id.* at 1367 (quoting *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)).

[21]*Id.*

[22]*Id.* at 1366.

[23]366 F.3d 1145, 1149 (10th Cir. 2004).

14

After Defendant told the trooper he could check the car, the trooper clarified that he wanted to search the car instead of just check it and asked if Defendant understood. Defendant agreed. Further, the request to search was made after the trooper asked Defendant if he had any illegal drugs in the car. When an officer expresses an intent to search for drugs, "that certainly implies that the officer could look wherever drugs might be hidden."[24] Trooper Hogelin's clarification that he wanted to search for drugs instead of just check for drugs shows the broad scope that Defendant agreed to when consenting to the search.

Furthermore, Defendant never stopped the troopers while they were searching nor asked to limit the search. The scope of a search is generally defined by an express objection and failure to object to a search indicates that the search is within the scope of the consent.[25] Defendant not only failed to object to the search, but consented to a more thorough search when the officers asked him if they could take the car to the KDOT facility to take a closer look at it. Once they arrived at the KDOT facility, Trooper Hogelin again asked Defendant if they could search the vehicle and he agreed. Defendant had many opportunities to object to the search but he continually affirmed that the troopers could search his vehicle. Thus, Defendant showed that he freely and intelligently consented to more than just a "check" of the vehicle—he freely and intelligently consented to a full search of the vehicle. As a result, the Court finds that Defendant gave valid consent to the search and the troopers did not exceed that consent.

## III. Conclusion

The Court finds that the initial traffic stop was justified by Defendant's violation of

---

[24] *United States v. Ramstad*, 308 F.3d 1139, 1146–47 (10th Cir. 2002).

[25] *Pena*, 143 F.3d at 1367–68.

Kansas traffic laws. Additionally, during the reasonable scope of the traffic stop, Trooper Hogelin developed reasonable and articulable suspicion that Defendant was engaged in illegal activity. This suspicion justified an investigatory detention beyond that justified by the initial traffic violation. Nevertheless, Trooper Hogelin ended the detention and the encounter became consensual. During the consensual encounter, Defendant gave valid consent for a search of his vehicle and the troopers did not exceed the scope of the consent. As a result, no Fourth Amendment violation occurred, and the Court must deny Defendant's motion to suppress.

**IT IS HEREBY ORDERED BY THE COURT** that Defendant's motion to Suppress Evidence (Doc. 14) is **DENIED**.

**IT IS SO ORDERED**.

Dated: December 7, 2011

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE